# EXHIBIT
# "A"

# In The Matter Of:

*Alison Valente, et al v.*
*International Follies d/b/a The Cheetah & Hagood*

---

*John P. Braglia*
*July 25, 2017*

---



**WSG REPORTING, LLC**

**Whitney S. Guynes, CCR**
*Owner*

*Certified Court Reporting*
(770) 367-7822
2745 Daniel Park Run
Dacula, GA 30019

wsgreporting.com
office@wsgreporting.com

*Original File 0725braglia-RKC.txt*
*Min-U-Script® with Word Index*

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION

 3

 4   ALISON VALENTE, JENNIFER
     BARLOW, KATHRYN MONROE,
 5   SOPHIA SMITH, STEPHANIE
     LEBEAU on behalf of              CIVIL ACTION
 6   themselves and all others        FILE NO.
     similarly situated,              1:15-CV-02477-ELR
 7
                     Plaintiff,
 8
              vs.
 9
     INTERNATIONAL FOLLIES, INC.,
10   d/b/a THE CHEETAH and WILLIAM
     HAGOOD,
11
                     Defendants.
12

13

                      DEPOSITION OF
14
                     JOHN P. BRAGLIA
15
                  Tuesday, July 25, 2017
16
                        10:04 a.m.
17
                       Suite 2700
18                  260 Peachtree Street
                      Atlanta, Georgia
19

20         Renda K. Cornick, RPR, CCR-B-909

21
                   WSG REPORTING, LLC
22                 2745 Daniel Park Run
                   Dacula, Georgia 30019
23                    (770) 367-7822
                 Office@WSGreporting.com
24

25
```

```
1                    APPEARANCES OF COUNSEL

2
     On behalf of the Plaintiffs excluding Alison Valente:
3
          AINSWORTH G. DUDLEY, JR., Esq.
4         Ainsworth Dudley
          Building One, Suite 200
5         4200 Northside Parkway
          Atlanta, Georgia 30327
6         404-687-8295
          adudley@gmail.com
7
          MICHAEL L. CHAPMAN, Esq.
8         Michael L. Chapman, P.C.
          Building One, Suite 200
9         4200 Northside Parkway
          Atlanta, Georgia 30327
10        404-734-8570
          mchapman@chapmanfirm.com
11

12   On behalf of Alison Valente:

13        LARRY A. PANKEY, Esq.
          Pankey & Horlock
14        Suite 200
          1441 Dunwoody Village Parkway
15        Atlanta, Georgia 30338
          770-670-6250
16        lpankey@pankeyhorlock.com

17
     On behalf of the Defendant:
18
          ANDREA LYNN PAWLAK, Esq.
19        KEVIN WARD, Esq.
          DEAN FUCHS, Esq.
20        Schulten, Ward, Turner & Weiss , LLP
          260 Peachtree Street, N.W.
21        Suite 2700
          Atlanta, Georgia 30303
22        404-688-6807
          a.pawlak@swtwlaw.com
23        k.ward@swtwlaw.com
          d.fuchs@swtwlaw.com

24

25                       - - -
```

```
 1                    TABLE OF CONTENTS

 2      Witness                                    Page

 3   JOHN P. BRAGLIA

 4      Examination by Mr. Dudley                    4

 5

 6                       - - -

 7   Plaintiff's
        Exhibit              Description           Page
 8

 9   Exhibit 1    International Follies, Inc.
                  Contract Entertainer Policies      56
10
     Exhibit 2    Night Shift Entertainer
11                Orientation and Guidelines         59

12   Exhibit 3    DJ Tipout Sheet                   115

13   Exhibit 4    Cassell Order on Claimant's
                  Motion for Partial Summary Judgment 153
14
     Exhibit 5    Cuesta Partial Final Award        154
15

16
         (Original Exhibits 1 through 5 have been attached
17   to the original transcript.)

18

19

20

21

22

23

24

25
```

```
 1                  MS. PAWLAK:  In which case?

 2                  MR. DUDLEY:  This case.

 3                  THE WITNESS:  I don't think so.

 4        Q.     (By Mr. Dudley)  How old are you,

 5   Mr. Braglia?

 6        A.     64.

 7        Q.     You have worked at The Cheetah since 1990;

 8   is that correct?

 9        A.     Around '88.

10        Q.     '88.  That's right.  You started working

11   in '88 as a bartender.  You were promoted to be a day

12   manager sometime before 1990, correct?

13        A.     Correct.

14        Q.     And then you have been the general manager

15   since 1990; is that correct?

16        A.     Roughly.

17        Q.     And if I understand from your prior

18   testimony that as a GM, you oversee -- this is your

19   language, quote, oversee every bit of the operation,

20   end quote.

21               Is that a correct statement?

22        A.     Correct.

23        Q.     Day manager and night manager at Cheetah

24   report to you?

25        A.     Yes.
```

1      A.      A scheme sounds corrupt.

2      Q.      Well, if I ask you that, I don't think

3  scheme necessarily has any type of bad connotations to

4  it.  It just means a way of doing something.

5           MS. PAWLAK:  Why not ask him a way of

6       doing something instead of using a word that he

7       believes is --

8           MR. DUDLEY:  It is my deposition.  I will

9       ask the question.  You can object if you want to

10      the --

11          MS. PAWLAK:  I will.  But he has answered

12      he believes scheme has a negative connotation.

13     Q.      (By Mr. Dudley)  I will not use that

14  phrase if you feel that's what it does.

15          The point of the question -- I think you

16  understand -- is simply you are the person as GM,

17  ultimate decisionmaker, you are the person who decided

18  what entertainers were to tip out; is that correct?

19     A.      Correct.

20     Q.      You were the person who decided what type

21  of fees and fines the entertainers had to pay Cheetah,

22  correct?

23     A.      Correct.

24     Q.      At all times since you have been GM, you

25  were the one making those decisions.

1        A.      Correct.

2        Q.      As GM, it is your decision to establish

3   the procedures, guidelines, that sort of thing that

4   entertainers worked under, correct?

5        A.      Correct.

6        Q.      Do you believe there was anybody over

7   Cheetah that shares responsibility for those type of

8   decisions?

9        A.      No.

10       Q.      Now, I went through your deposition

11  before.  You tell me whether this is a true statement.

12  You said that you made the decisions regarding

13  Cheetah's operations.  That's correct, right?

14       A.      Correct.

15       Q.      You made the decisions regarding Cheetah's

16  advertising; is that correct?

17       A.      Correct.

18       Q.      You made the decisions regarding Cheetah's

19  marketing, correct?

20       A.      Correct.

21       Q.      You made the decisions regarding the food

22  and drink that you served at Cheetah; is that correct?

23       A.      Correct.

24       Q.      You made the decisions regarding the type

25  of music to be played at Cheetah, correct?

```
 1   when they were an independent contractor because they
 2   did whatever they wanted and that's what they --
 3   that's what entertainers are used to.  They have
 4   always believed that they are independent contractors.
 5        Q.    Did you give us a set of rules back in the
 6   Cuesta and Cassell arbitrations that were used at
 7   Cheetah in basically the same form ever since you were
 8   GM?
 9             MS. PAWLAK:  I object to the form.
10             You just said he gave them to you.  I
11         think they were produced by The Cheetah if they
12         were produced in some form by that case.
13        Q.    (By Mr. Dudley)  You are aware that
14   Cheetah gave us a set of guidelines involving
15   entertainers in the Cuesta and Cassell arbitration,
16   are you not?
17        A.    Yeah.  There were forms that we handed
18   over.
19        Q.    Mr. Miller went through lengthy testimony
20   with you about those policies, correct?
21        A.    Correct.
22        Q.    And my understanding from that deposition
23   is that that set of rules had been in force at Cheetah
24   roughly the whole time you had been GM; is that
25   correct?
```

1       A.      Yes.  But not -- there was one set of
2   forms he gave me that were not Cheetah forms that were
3   created by a housemom that I had no knowledge of and
4   that were not a Cheetah rule or document.
5       Q.      When were those created?
6       A.      I don't know.
7       Q.      All right.  So you say there was a
8   difference in scheduling and control back in 1993.
9   Anything else with control that you can think of?
10      A.      Not offhand.  It was a long time ago.
11      Q.      Do you have any documents from that time
12  period such as the rules that could be produced to us?
13  When I say you, I am referring to Cheetah.
14          MS. PAWLAK:  Objection to form.
15          THE WITNESS:  From '93?
16      Q.      (By Mr. Dudley)  Yes.
17      A.      No.
18      Q.      Do you have anything from 2000 that could
19  be produced to us?
20          MS. PAWLAK:  Objection to form.
21          THE WITNESS:  No.
22      Q.      (By Mr. Dudley)  You have no guidelines,
23  rules, procedures existing prior to 2001; is that
24  correct?
25          MS. PAWLAK:  You mean The Cheetah.

```
1      Q.     Did Cheetah replace him with corporate
2  counsel?
3      A.     No.
4             MS. PAWLAK:  Objection to form.
5      Q.     (By Mr. Dudley)  When Mr. Miller took your
6  deposition back in 2015, you testified that you were
7  pretty hands-on with the hiring of entertainers at
8  Cheetah.  Your testimony was that you hired every
9  entertainer.  Is that still the case?
10     A.     Pretty much.  I relaxed it a little bit.
11     Q.     When you say that you hired them all, did
12 they know you were involved in the process or
13 sometimes you are in the background, they don't know
14 that you are auditioning?
15     A.     Right.  Some of them don't know that I am
16 the one that made the decision.
17     Q.     So if an entertainer says, I don't
18 remember Jack being there, that very likely could be
19 she didn't know you were there.
20     A.     Correct.
21     Q.     So tell me how the typical audition would
22 work.
23     A.     The entertainer is put up on the main
24 stage and dances for maybe one song and undresses and
25 I make a decision.
```

1   be responsible for paying a late fine.

2        Q.      That's what was told to the girls,

3   correct?

4        A.      Correct.

5        Q.      Now, as I understand the fines -- first of

6   all, when did the fines stop for being late, if ever?

7        A.      April 9th, 2016.

8        Q.      So when you reclassified to employees

9   April 9th, 2016, you quit fining girls for being late

10  to work, right?

11       A.      Right.

12       Q.      Before that time, fined $25 if they came

13  in between 8:00 and 12:00, 35 between 9:00 and 9:30,

14  and 50 if it was 9:30 to 9:45, correct?

15       A.      Correct.  But it was arbitrary.

16       Q.      Again, that was something that was told to

17  the entertainers, correct?

18       A.      Yes.

19       Q.      And what happened was the housemom would

20  fine them.  She would collect the fines, then she

21  would give them to you, right?

22       A.      Yes.

23       Q.      Then you would put them in your pocket,

24  correct?

25       A.      I would take the fines and then I would

```
 1   use them for spreading the love, tipping the girls.
 2        Q.     But as I understood it from your prior
 3   testimony is that those fines did not go on the books
 4   at Cheetah.
 5        A.     Correct.
 6        Q.     There were no records of those fines.
 7        A.     Correct.
 8        Q.     Now, the first lawsuit that entertainers
 9   filed against Cheetah was back in 2013 and from 2013
10   up until April the 9th of 2016 when you stopped that
11   process, did you take any action, start recording what
12   those late fines were?
13        A.     No.
14        Q.     You didn't keep records even though you
15   knew entertainers were asking for that as a portion of
16   their damages, correct?
17        A.     Correct.
18        Q.     Do you understand that the Fair Labor
19   Standards Act requires you to keep proper records of
20   deductions from employee's pay?  Do you understand
21   that?
22             MS. PAWLAK:  Object as to form.
23             He is not going to answer as to the legal
24        conclusions.
25             THE WITNESS:  I don't know.
```

1   either stage dancing or table dancing or VIP, right?

2        A.    If someone wants to pay a girl for a table

3   dance and he is sitting at a stage, he gets the girl

4   to do the table dance on the stage in front of him.

5        Q.    Cheetah sets the price for a table dance.

6        A.    Yes.

7        Q.    That's $10.

8        A.    Yes.

9        Q.    Dancers are forbidden for asking for more

10  than $10 a dance anywhere in the club.

11       A.    Yes.

12       Q.    There are rules about how an entertainer

13  can approach a customer for table dances, correct?

14       A.    Yes.

15       Q.    And that is that they -- Cheetah doesn't

16  like them to go from person to person asking for table

17  dances, right?

18       A.    Right.

19       Q.    Cheetah does not want the customers to be

20  harassed by the dancer; is that correct?

21       A.    Yes.

22       Q.    The next bullet point, if you could read

23  that fourth bullet point for me, first sentence.

24       A.    We suggest getting paid before or after

25  each song rather than dancing for several songs and

1      A.      They are not supposed to.  Some of them

2  do.

3      Q.      Well, if you could read the third sentence

4  of bullet point 3.

5      A.      Entertainers may charge up to $300 per

6  hour, but sometimes on slow nights a girl may cut a

7  deal.

8      Q.      Is that an accurate statement of Cheetah's

9  policy?

10     A.      No.

11     Q.      So you say the difference is they are not

12  supposed to negotiate that rate?

13     A.      Right.

14     Q.      It would be an accurate statement that

15  Cheetah controls the hourly rate the girl can charge.

16     A.      Yes.

17     Q.      If you go down to the fifth bullet point.

18     A.      Okay.

19     Q.      If you could read that first sentence.

20     A.      Make sure that your customer understands

21  and agrees to pay you hourly.

22     Q.      Is that a true and correct statement of

23  the Cheetah's policy?

24     A.      Yes.

25     Q.      Would you agree with the statement that

1    guidelines under the DJ tipout bullet point expressly

2    states that there is a tipping chart in the housemoms'

3    desk if you are not sure what you should tip, correct?

4          A.     Correct.

5          Q.     And that was what was told to entertainers

6    as far as you know by the housemoms.

7          A.     Yes.

8          Q.     Is there any other reason for an

9    entertainer to go see the DJ at the end of the night

10   other than to tip him out?

11         A.     No.

12         Q.     If you go to the next bullet point on the

13   next page, Page 8, says housemom tipout.  Could you

14   read that next sentence, please.

15         A.     Your next stop will be the housemoms' desk

16   to pay your fees, if any.  Once finished it is

17   customary to tip your housemom.

18         Q.     So after the entertainer goes to the DJ,

19   she is supposed to go to the housemom and pay her

20   fees; is that correct?

21         A.     Yes.

22         Q.     Did you understand that it was customary

23   at Cheetah for entertainers to tip out the housemom at

24   the end of their shifts?

25         A.     Yes.

1      Q.     And you understand that Cheetah maintains

2   no records of VIP transactions, correct?

3      A.     Correct.

4      Q.     And you have never included VIP room

5   charges in Cheetah's gross receipts, correct?

6      A.     Correct.

7      Q.     Now, can you please tell me how you are

8   claiming a service charge in this case given those

9   factors.

10          MS. PAWLAK:  Objection to form.

11     Q.     (By Mr. Dudley)  In good faith.

12          MS. PAWLAK:  Objection to form.

13          THE WITNESS:  I believe it because we set

14      the price for them.

15     Q.     (By Mr. Dudley)  And I don't want you to

16   reveal any advice an attorney has given you.  But have

17   you received advice from an attorney about whether

18   service fees are -- or VIP fees are, in fact, service

19   fees under the FLSA given your situation?

20          MS. PAWLAK:  Objection to form.

21          THE WITNESS:  No.

22     Q.     (By Mr. Dudley)  That is despite the fact

23   that you have had numerous attorneys represent Cheetah

24   at least since 2013, correct?

25          MS. PAWLAK:  Objection to form.

1          Q.     (By Mr. Dudley)   Correct?

2          A.     Correct.

3          Q.     Many of those attorneys are FLSA

4     attorneys, defending FLSA cases brought against you,

5     correct?

6          A.     Correct.

7          Q.     You say that those fees belong to Cheetah,

8     is that what you are trying to tell me, the VIP fees

9     belong to Cheetah?

10         A.     Yes.

11         Q.     And what is your basis for that?

12         A.     That we set the price for them, that they

13    control the price for it.

14         Q.     Well, your own guidelines say that that is

15    negotiable, right?

16         A.     Again, you are talking about a

17    housemom-written document.

18         Q.     Your own guidelines state that that

19    belongs to the dancers, right?

20              MS. PAWLAK:   Objection to form.

21              THE WITNESS:   Same answer.

22         Q.     (By Mr. Dudley)   What document creates a

23    right in Cheetah to the VIP fees?

24         A.     I don't know.

25         Q.     Does it exist?

```
 1        A.      Not that I know of.
 2        Q.      I am going to ask you the same thing about
 3    the table dance.  Are you contending that the table
 4    dance is a service fee under the FLSA?
 5        A.      Yes.
 6        Q.      What is the basis for that contention?
 7        A.      That we set the price.
 8        Q.      Again, you would acknowledge the table
 9    dance is paid directly by the customer to the
10    entertainer, correct?
11        A.      Correct.
12        Q.      You would agree that your own rules state
13    the table fees belong to the entertainers, right?
14        A.      Right.
15        Q.      You would agree that table dance fees paid
16    to entertainers are never included in Cheetah's gross
17    receipts, correct?
18        A.      Correct.
19        Q.      You would agree you have absolutely no
20    records of table dances ever done by any entertainer
21    at Cheetah, correct?
22        A.      Correct.
23        Q.      Your good-faith basis for asserting a
24    service defense in this case, service charge defense
25    is that Cheetah set the rate, therefore it is a
```

1        A.      Yes.

2        Q.      I want to ask you some questions about

3    recordkeeping before 4/9/17.

4                What is the best source of determining the

5    number of hours an entertainer worked at Cheetah?

6        A.      The timesheets.

7        Q.      Tell me exactly what the timesheets are.

8        A.      Timesheets, an Excel sheet.  That's

9    produced from the handwritten sign-in, sign-out sheets

10   that the housemoms then transfer to an Excel sheet on

11   a daily basis.

12       Q.      Excel sheets, is that a weekly or daily

13   thing?

14       A.      It is done daily.  And then at the end of

15   the week, it is e-mailed to me and a hard copy goes in

16   a binder.

17       Q.      Is the weekly form different than the

18   daily Excel form?

19       A.      Well, the daily form is -- they continue

20   adding onto it to create a week.

21       Q.      Same document?

22       A.      Yeah.

23       Q.      So you have a handwritten sheet that the

24   housemom uses.

25       A.      Daily.

1       Q.      Daily.  You have an Excel spreadsheet that
2  is kept daily that turns into a weekly report.
3       A.      Yes.
4       Q.      Which is given to you and then you have
5  spreadsheets that you created for purposes of
6  litigation which you have given to us; is that
7  correct?
8       A.      Correct.
9       Q.      Anything else that would show the number
10 of hours that an entertainer worked?
11      A.      No.
12      Q.      And there are no documents showing wages
13 paid because up until April 9th, 2017, the
14 entertainers were not paid any wages, right?
15              MS. PAWLAK:   2016.
16      Q.      (By Mr. Dudley)  I am sorry, April 9th,
17 2016.
18      A.      Correct.
19      Q.      Since April 9th, 2016, there are
20 computer-generated documents showing the wages paid to
21 entertainers.
22      A.      Yes.
23      Q.      We have already established there are no
24 documents indicating the number of table dances, the
25 amounts received by entertainers for table dances,